ACCEPTED
03-13-00493-CR
5686590
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/15/2015 9:56:08 PM
JEFFREY D. KYLE
CLERK

No. 03-13-00493-CR

IN THE COURT OF APPEALS
THIRD DISTRICT
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/15/2015 9:56:08 PM
JEFFREY D. KYLE
Clerk

GERALD CHRISTOPHER ZULIANI,
APPELLANT

vs.

THE STATE OF TEXAS,
APPELLEE

APPEAL FROM THE 167TH DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NUMBER D-1-DC-13-900137

STATE'S MOTION FOR REHEARING

ROSEMARY LEHMBERG
DISTRICT ATTORNEY

M. SCOTT TALIAFERRO
TEXAS BAR NO. 00785584
ASSISTANT DISTRICT ATTORNEY
DIRECTOR, APPELLATE DIVISION
TRAVIS COUNTY DISTRICT ATTORNEY'S OFFICE
P.O. BOX 1748
AUSTIN, TEXAS 78767
PHONE: 512.854.3626    FAX: 512.854.4180
EMAIL:    scott.taliaferro@traviscountytx.gov
          AND AppellateTCDA@traviscountytx.gov

# TABLE OF CONTENTS

FACTUAL AND PROCEDURAL BACKGROUND ..............................................2

THE STATE'S POINT OF ERROR ........................................................................4

THE COURT OF APPEALS MISAPPLIED THE *JACKSON V. VIRGINIA* STANDARD OF REVIEW WHEN IT FOUND THE EVIDENCE LEGALLY INSUFFICIENT TO SUPPORT A FINDING THAT THE APPELLANT ACTED WITH INTENT TO DEPRIVE THE VICTIM OF HER CHECK.........................................................................................................................4

1. The Court did not consider the evidence in the light most favorable to the verdict…………………………………………………………………………5

2. The Court appears not to have considered several inferences that support the conclusion that the appellant facilitated his girlfriend's withdrawal of the funds………………………………………………………………………..…..8

    a. The evidence supports an inference that the appellant was accompanied by his girlfriend when he deposited the check………...…9

    b. The evidence supports an inference that the appellant facilitated his girlfriend's withdrawals by providing his debit card to her………....11

    c. The records from the appellant's other financial institution support an inference that his girlfriend acted as his agent …………………….…..14

    d. The evidence supports an inference that the relationship between the appellant and the victim was over and that the appellant had no legitimate reason to deposit the check into the joint account…………..15

    e. The evidence supports an inference that the appellant knew that he needed the victim's consent and that he was nevertheless acting without it …………………………………………………………………….....16

PRAYER ...................................................................................................................17

CERTIFICATE OF COMPLIANCE ......................................................................18

CERTIFICATE OF SERVICE ...............................................................................18

**APPENDIX** ...........................................................................................................19

**IN THE COURT OF APPEALS**
**THIRD DISTRICT**
**AUSTIN, TEXAS**

**GERALD CHRISTOPHER ZULIANI,**
**APPELLANT**

**vs.**

**THE STATE OF TEXAS,**
**APPELLEE**

Appeal from the 167th District Court
Travis County, Texas
Cause Number D-1-DC-13-900137

**STATE'S MOTION FOR REHEARING**

To the Honorable Court of Appeals:

The State of Texas, by and through the District Attorney for Travis County, respectfully submits this motion for rehearing.

## FACTUAL AND PROCEDURAL BACKGROUND

At the time of the events at issue here, Stephanie Running ("the victim") lived in a house that she owned, and she shared that home with the appellant, who was her fiancé. Beginning on Sunday, October 21, 2012, the appellant engaged in a series of violent acts toward the victim. See 12 RR 102. That conduct resulted in four of the appellant's five convictions—i.e., convictions for the offenses of aggravated assault, aggravated kidnapping, assault with family violence, assault by strangulation with family violence. Each of those convictions was affirmed by this Court. *See Zuliani v. State*, Nos. 03-13-00490-CR, 03-13-00491-CR, 03-13-00492-CR, 03-13-00493-CR, 03-13-00495-CR, 2015 Tex. App. LEXIS 5506 (Tex. App.—Austin May 29, 2015) (not designated for publication). The Court's opinion is attached hereto as an appendix.

The jury also found the appellant guilty of theft, in relation to conduct that occurred on Thursday, October 25, 2012, the day when the victim escaped from the appellant and her home, which is where all of the physical abuse occurred. On the day before that escape, the appellant went to the mailbox and obtained a check that was payable to the victim. 12 RR 112-13. The $6,308.17 check, from Allstate insurance company, compensated the victim for property losses that she had previously sustained in connection with an automobile accident. *See* State's Exh. 85 at 55.

2

When she fled from her home on the morning of Thursday, October 25, the victim did not take her check with her; it remained inside of her house. 12 RR 132-33. Later that day, the appellant took the check and deposited it into a rarely-used, joint savings account at Wells Fargo Bank. He did so without the victim's consent. 12 RR 133. The check had not been endorsed by the victim or by anyone else. 12 RR 133; *see* State's Exh. 85 at 55. One week after that deposit was made, the appellant's girlfriend, Glennis Richter, was added to the joint account without the victim's knowledge or consent. *See* 12 RR 140. The girlfriend then withdrew all funds from the account.[1]

In his third point of error on direct appeal, the appellant challenged the sufficiency of the evidence to support the conviction for theft. This Court reversed the judgment of conviction for that offense and rendered a judgment of acquittal. *See id.*, slip op. at 27-30.

---

[1] These facts will be addressed in more detail below.

3

## THE STATE'S POINT OF ERROR

THE COURT OF APPEALS MISAPPLIED THE *JACKSON V. VIRGINIA* STANDARD OF REVIEW WHEN IT FOUND THE EVIDENCE LEGALLY INSUFFICIENT TO SUPPORT A FINDING THAT THE APPELLANT ACTED WITH INTENT TO DEPRIVE THE VICTIM OF HER CHECK.

### Argument and Authorities

When assessing the legal sufficiency of the evidence to support a conviction, an appellate court is required to apply the *Jackson v. Virginia* standard. Under that standard, the reviewing court must consider all of the evidence in the light most favorable to the verdict and then determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 43 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

In the instant case, the Austin Court of Appeals held that "there is insufficient evidence to conclude that Zuliani authorized the addition of Richter to the account." *Zuliani*, slip op. at 30 (emphasis added). The State hereby asks this Court to reconsider that determination. It appears that the Court did not consider the evidence in the light most favorable to the verdict, as is required by *Jackson*. It also appears that the Court did not consider several inferences that support the conclusion that the appellant facilitated his girlfriend's withdrawal of the funds.

4

1. <u>The Court did not consider the evidence in the light most favorable to the verdict.</u>

Central to this Court's conclusion was its evaluation of the Relationship Change Application by which the appellant's girlfriend gained access to the joint account, which had previously been accessible only by the appellant and the victim. Reasoning as follows, the Court concluded that the evidence was insufficient to support an inference that the appellant authorized the addition of Richter to the account:

> The State emphasizes that Richter later withdrew all funds from the account and argues that this is evidence that Zuliani was already intending to withdraw the funds at the time he deposited the check. At trial, the State called a bank investigator, who testified that on November 1, about a week after Running escaped and Zuliani was arrested, Zuliani added Richter to the joint account. The investigator referenced State's Exhibit 85 and stated that Zuliani's signature appeared on the signature card of the form adding Richter. However, we have reviewed this exhibit, and we agree with Zuliani that Zuliani's signature does not appear anywhere on the form. Zuliani points out that his name is written on the form in handwriting that is completely different from his signature on other forms in the record. We agree, but more importantly, none of the signatures on the form adding Richter to the account *even purport to be* Zuliani'<u>s</u>. Instead, it is evident from the face of the document that Richter herself signed Zuliani's name and then, in the same signature block, signed her own name and indicated that she had power of attorney to sign for Zuliani. Richter also signed her own name in Running's signature block. Therefore, only Richter's signature appears on the form. <u>Because the State did not introduce any evidence that Zuliani had granted Richter power of attorney or otherwise granted her authority to access funds in the account, there is insufficient evidence to conclude that Zuliani authorized the addition of Richter to the account</u>.

5

*Zuliani*, slip op. at 29-30 (emphasis added).

The State respectfully asserts that this Court erred when it concluded that the evidence is rendered insufficient in this regard by the State's failure to "introduce any evidence that Zuliani had granted Richter power of attorney or otherwise granted her authority to access funds in the account." *Id*. at 30. Here, the Relationship Change Application, viewed in the light most favorable to the verdict, is *itself* sufficient to support an inference that the appellant had granted Glennis Richter power of attorney, i.e., the authority to execute that document on his behalf. In two places on the document, Richter signed the appellant's name and, immediately below that signature, wrote the words, "Glennis K. Richter <u>Power of Attorney</u>." State's Exh. 85 at 12, 13 (20 RR 523, 524) (emphasis added). *See* Tex. Bus. & Com. Code § 3.402 (captioned *Signature by Representative*).

The circumstances surrounding Richter's execution of that Relationship Change Application provide further support for an inference that the appellant had in fact granted Richter the authority to execute that document on his behalf. The jury could reasonably have inferred from the document itself that the document was executed at a major financial institution and in the presence of the Wells Fargo banker named on the first page of that document (i.e., Ariel Barraza), and that Wells Fargo Bank was satisfied that Richter did indeed have such authority.

6

When viewed in the requisite light, the representations in this document that Richter had "power of attorney" should be taken at face value, even though those representations were made by the person who ultimately drained the funds from the account. Under the applicable standard of review, this Court cannot properly impose upon the State a requirement that it present *additional* "evidence that Zuliani had granted Richter power of attorney or otherwise granted her authority to access funds in the account." *Zuliani*, slip op. at 30. Under *Jackson*, the document itself should suffice.[2]

---

[2] The Court appears to have placed great weight on the bank investigator's testimony regarding the signatures that appear on the Relationship Change Application. The investigator, Robert Fernandez, testified, *inter alia*, as follows:

> Q. Okay. Again, referring to State's Exhibit 85, I want you to look at this page here, Page 3 of 4. And after reading that, can you tell us who added Ms. Richter to the account?
> A. Gerald Zuliani did, added her.
> Q. Okay. And what are we looking at, just for the record?
> A. This is an account signature card.
> Q. Besides Gerald Zuliani, are there any other signatures on this page?
> A. There is a signature for Glennis Richter.
> Q. Okay. So both Gerald Zuliani and Glennis Richter signed these pages -- or this page; is that correct?
> A. Yes, ma'am.

13 RR 225.

In this testimony, Fernandez makes two assertions, i.e., (a) that the appellant "added Ms. Richter to the account" and (b) that "both Gerald Zuliani and Glennis Richter signed … this page." 13 RR 225. Even if the jury concluded (as this Court did) that the appellant did not *personally* sign the document, the jury could still have found credible the investigator's testimony that the appellant "added her." *Id*. This is especially true in light of the fact that the jury might reasonably have inferred that the appellant "added her" by giving Richter the authority to sign the document on his behalf. When performing its sufficiency analysis, this Court is required to presume that the jury resolved any conflicting inferences in favor of the State and defer to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

2. <u>The Court appears not to have considered several inferences that support the conclusion that the appellant facilitated his girlfriend's withdrawal of the funds.</u>

The record contains evidence suggesting that the appellant facilitated Glennis Richter's withdrawal of funds from the joint account. That evidence is probative because it provides a basis upon which the jury could reasonably have concluded that the appellant took and deposited that check with intent "to dispose of property in a manner that makes recovery of the property by the owner unlikely."[3] Tex. Penal Code § 31.01(2)(C). Before the appellant took that check and deposited it, those funds were solely owned by Stephanie Running and accessible only by her.[4]

---

[3] Defining the offense of theft, Penal Code section 31.03 provides, *inter alia,* "A person commits an offense if he unlawfully appropriates property with intent to <u>deprive</u> the owner of property." Tex. Pen. Code § 31.03(a) (emphasis added). In pertinent part, Penal Code section 31.01 defines the term "deprive" as follows:

> (2) "Deprive" means:
>
> (A) to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner;
>
> \*\*\*
>
> (C) to dispose of property in a manner that makes recovery of the property by the owner unlikely.

Tex. Penal Code § 31.01(2)(A), (C). The appellant suggests that the resolution of his claim should be resolved on the basis of the definition in subsection (2)(A). *See* Appellant's Brief at 45. However, the definition in subsection (2)(C) should also be considered during this Court's analysis.

[4] If the appellant, by depositing the check into the joint account, acquired an ownership interest in the underlying funds, that fact should weigh heavily in favor a determination that he acted with intent to deprive the victim of both the check and those funds. However, the extent to which he obtained such an interest is not entirely clear. For example, it appears that, by

a.  The evidence supports an inference that the appellant was accompanied by his girlfriend when he deposited the check.

The appellant deposited the victim's insurance check into the account via a drive-through ATM at a Wells Fargo branch. To make the deposit, the appellant used the Wells Fargo debit card that had been assigned to him. That debit card had a card number ending in the digits 2614. 13 RR 220-21, 228. Surveillance photos of that transaction show the appellant in the driver's seat of a car. *See* State's Exhibits 87 and 88. Significantly, one such photo also reveals that the appellant was accompanied by a woman. That woman, seated in the passenger seat of the car, can be seen looking attentively in the direction of the ATM machine as the appellant consummates the transaction. *See* State's Exh. 87 .

The woman in the car with the appellant was not Stephanie Running, the victim of these offenses. *Compare* State's Exh. 87 *with* State's Exhibits 8 and 83. The record reflects that Ms. Running was at a hospital in Round Rock when the

---

depositing the check, the appellant acquired an interest in the funds sufficient to enable him to pledge or transfer all such the funds to Wells Fargo Bank. *See* Tex. Fin. Code Ann. § 95.102. On the other hand, some case law appears to suggest that, by making the deposit, the appellant gained access to the underlying funds but may not actually have acquired any title in those funds. *See Hicks v. State*, 419 S.W.3d 555, 558-59 (Tex. App.—Amarillo 2013) ("[A] party to a joint account is entitled to lawfully draw monies from the account. That authority alone, however, does not establish the party's ownership of the funds. Nor does it alone divest title to the funds from the actual owner."); *see Bailey v. State*, No. 03-02-00623-CR, 2003 Tex. App. LEXIS 10141, at *15 (Tex. App.—Austin December 4, 2003, pet. ref'd) (not designated for publication).

In the instant case, the offense of theft was predicated upon the appellant's conduct in taking and depositing the check, not upon the subsequent withdrawal of the funds from the account. But for his act of depositing the check, the funds could not have been withdrawn by his girlfriend.

9

appellant made that deposit. *See* 12 RR 128-29; *see also* State's Exh. 26 (medical records).

Instead, the evidence supports an inference that the woman accompanying the appellant was his girlfriend, Glennis Richter. The woman seen in State's Exhibit 87 has the appearance of Glennis Richter. The jury received surveillance photos showing Richter making two withdrawals from the joint account.[5] *See* State's Exhibits 90 and 91. By comparing State's Exhibit 87 (depicting the deposit of the insurance check on October 25) with State's Exhibit 90 (depicting Richter's withdrawal of $20.00 on November 1) and State's Exhibit 91 (depicting Richter's November 6 withdrawal of $1,009.07), the jury could reasonably have concluded that the same woman appears in all three photos and that Glennis Richter was literally by the appellant's side when he engaged in the conduct alleged in the indictment.

Such a conclusion would also have been supported by the circumstances surrounding the deposit, which suggest that the woman in the photo was a person with whom the appellant shared a relationship of some sort. According to the evidence presented at trial, the appellant did not have a vehicle of his own on the day of the deposit. *See, e.g.*, State's Exh. 84 (where the appellant states, in

---

[5] It is beyond dispute that Glennis Richter was the person who withdrew the funds from the account. *See* App. Brief at 43, 47.

10

recorded phone message left for Ms. Running earlier that day, "I'm stuck here. I got no way to get around.")[6] Yet State's Exhibit 87 shows not only that the appellant gained access to a car, but also that he was even allowed to drive that car. Thus, the jury could reasonably have inferred that the car depicted in the bank's surveillance photos belonged to the woman in the passenger seat and that the appellant's relationship with the woman was one that enabled him to drive her car. Such an inference would naturally buttress the conclusion that woman accompanying the appellant when he deposited the $6,308.17 check was his girlfriend, Glennis Richter.

  b. <u>The evidence supports an inference that the appellant facilitated his girlfriend's withdrawals by providing his debit card to her.</u>

The Wells Fargo Bank debit card assigned to the appellant was used to perform a number of the transactions at issue here. First, that card was utilized by the appellant when he (accompanied by Glennis Richter) deposited the victim's insurance check. *See* 13 RR 220-21, 228; State's Exhibits 87 and 88.

Next, that very same card was used by Glennis Richter on November 1, at 11:48 a.m., when she withdrew $20.00 from the joint account via an ATM

---

[6] The record suggests that Stephanie Running, the victim, was not familiar with the vehicle the appellant was driving when he deposited her check. She testified that she did not recognize the car depicted in State's Exhibit 86. That exhibit, however, was not offered into evidence. *See* 12 RR 198-99.

machine.[7] *See generally* 13 RR 223, 232. As Wells Fargo Bank Investigator Robert Fernandez testified, "Because these transactions were done at an ATM, an ATM card had to be used. A customer will put the card in and from that transaction an image or a photo is taken of that particular transaction which will include the date, the time, and the last four numbers of the card used for that transaction." 13 RR 219-20. A surveillance photo depicting the $20.00 withdrawal reflects that it was performed with "Card Number XXXXXXXXXXXX2614." State's Exh. 90; *see* State's Exh. 85 at 47 (20 RR 558) (reflecting "ATM Withdrawal" and "2614"). According to Fernandez, the Wells Fargo debit card ending in digits 2614 "was assigned to Gerald Zuliani." 13 RR 228. Richter's use of that card on November 1—the very same day that Richter executed the Relationship Change Application and represented that she had power of attorney—seems especially probative.

That same card was used again by Glennis Richter on November 5, 2012, when she withdrew $300.00 from the joint account. *See* 13 RR 227-28; State's Exh. 85 at 47 (20 RR 558) (reflecting "ATM Withdrawal" and "2614"). The testimony of Fernandez makes it clear that "the same card that was used on October 25th to deposit the check is the same card that was used to withdraw $300 on November 5th." 13 RR 228. Under the applicable standard of review, this

---

[7] As was noted above, it is beyond dispute that Glennis Richter was the person who withdrew the funds from the account. *See* App. Brief at 43, 47.

testimony should foreclose any notion that Richter may merely have used a different card that had the same card number as the appellant's card.

Viewed in the light most favorable to the verdict and in light of all of the evidence presented to the jury, Glennis Richter's use of the appellant's debit card supports an inference that she used it with his permission. Such an inference is strengthened by the fact that Richter actually accompanied the appellant when he used that same card to deposit the victim's check into the account on October 25. Indeed, the very nature of the relationship between the appellant and Richter has probative value here. Glennis Richter was not a stranger to the appellant. Rather, she was described at trial as his girlfriend. While the use of the appellant's debit card by a stranger might not give rise to an inference that the card was used with his permission, such an inference is certainly reasonable where the person using the card was a girlfriend who also signed a bank document indicating that she had been given power of attorney.

Importantly, Richter's access to the account via the appellant's debit card was completely independent of the access she obtained via the Relationship Change Application at issue here. Even if it is assumed, *arguendo*, that "there is insufficient evidence to conclude that Zuliani authorized the addition of Richter to the account" (*Zuliani*, slip op. at 30), the evidence is nevertheless sufficient to establish that the appellant permitted Richter to gain access to the account in

13

another way – i.e., through the use his debit card.  In light of this evidence alone, the Court should reconsider and correct its conclusion that "the State did not introduce any evidence that Zuliani had … granted her authority to access funds in the account."  *Zuliani*, slip op. at 30.

      c.  <u>The records from the appellant's other financial institution support an inference that his girlfriend acted as his agent.</u>

Wells Fargo Bank was not the only institution where the appellant kept money.  He also had accounts at the United Heritage Credit Union.  Records from that credit union reveal that Richter transacted business there for the appellant at around the same time that she made the withdrawals from the joint account at Wells Fargo Bank.  On November 16, 2012, for example, she executed United Heritage Credit Union documents on the appellant's behalf, signing them as "Glennis K. Richter POA for Gerald Christopher Zuliani."  State's Exh. 140 (20 RR 843, 848, 849).  Introduced into evidence as part of that credit union's records is a document entitled, "Statutory Durable Power of Attorney," which purports to have been executed on November 7, 2012—one day after Richter emptied the joint account at Wells Fargo Bank.  By signing that document, the appellant appointed Glennis Richter as his agent or attorney-in-fact to act for him in a wide variety of contexts, including "[b]anking and other financial institution transactions."  State's Exh. 140 (20 RR 818).

14

It is clear that these credit union documents were executed subsequent to the Glennis Richter's last withdrawal of funds from the joint account at Wells Fargo Bank. However, the timing of these credit union documents weighs against any inference that that Richter accessed the joint account without the appellant's authority. If she truly lacked his approval when draining thousands of dollars from the appellant's account at Wells Fargo bank, why would the appellant thereafter grant her power of attorney to engage in similar conduct at a different financial institution?

    d. <u>The evidence supports an inference that the relationship between the appellant and the victim was over and that the appellant had no legitimate reason to deposit the check into the joint account.</u>

The victim testified that she escaped from her home on Thursday, October 25. When she returned to her house later that evening, she noticed that the appellant had moved out of her house. She explained, "Chris had been packing and had taken some of his stuff. There were clothes on hangers in the spare bedroom that hadn't been there, half of his clothes in the closet that we shared were gone." 12 RR 131. Importantly, the victim's check was deposited by the appellant between the time of her escape and the time when she returned home that evening. In light of the brutality that the appellant inflicted upon the victim during the preceding days, and the fact that the relationship had come to an abrupt end, the jury could reasonably have concluded that the appellant had no legitimate reason

15

for depositing the check into the joint account.  Simply put, there was no reason to deposit funds into the couple's vacation account because the appellant no longer considered them to be a couple.  Indeed, the jurors may reasonable have inferred from these circumstances that the appellant's only conceivable reason for depositing the check was an illegitimate one – i.e., to gain access to the underlying funds so that he could use those funds for his own benefit.

e. The evidence supports an inference that the appellant knew that he needed the victim's consent and that he was nevertheless acting without it.

After the victim escaped on the morning of Thursday, October 25, 2012, the appellant called her, but she did not answer her phone.  The appellant left her a voicemail message, but the victim did not listen to the message at that time.  12 RR 126; *see* State's Exh. 84.  At about 10:23 that same morning, the appellant also sent a text message to the victim, asking her for permission to deposit the check. *See* Def. Exh. 29 (showing text message stating, "If I get by the bank May I deposit the check from the accident?").  The victim did not respond to that text message. 12 RR 128.

Viewed in the light most favorable to the verdict, the fact that the appellant actually requested the victim 's consent supports an inference that he *knew* that he could not properly deposit the check without such consent.  In other words, this Court cannot reasonably conclude either that the appellant *assumed* that he had the

16

necessary consent or that he simply *did not consider* the issue of whether he had such consent.

The fact that the appellant deposited the check—without consent and with knowledge that he needed such consent—therefore provides further support for an inference that he negotiated that check with intent to deprive the victim of the check and its underlying funds.

<u>PRAYER</u>

WHEREFORE, the State requests that the Court reconsider its ruling, overrule the appellant's third point of error, and affirm the judgment of the trial court.

Respectfully submitted,

Rosemary Lehmberg
District Attorney
Travis County, Texas

*/s/ M. Scott Taliaferro*
M. Scott Taliaferro
Texas Bar No. 00785584
Assistant District Attorney
District Attorney's Office
P.O. Box 1748
Austin, Texas 78767
Phone: 512.854.3626  Fax: 512.854.4180
Email: scott.taliaferro@traviscountytx.gov
    and AppellateTCDA@traviscountytx.gov

17

CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i), I hereby certify, based on the computer program used to generate this brief, that this motion contains 4,161 words, excluding words contained in those parts of the brief that Rule 9.4(i) exempts from inclusion in the word count. I certify, further, that this motion is printed in a conventional, 14-point typeface except for footnotes, any and all of which are printed in a conventional, 12-point typeface.

/s/ *M. Scott Taliaferro*
M. Scott Taliaferro

CERTIFICATE OF SERVICE

I hereby certify that, on this 15th day of June, 2015, a copy of the foregoing motion for rehearing was sent was sent, via U.S. mail, email, facsimile, or electronically through the electronic filing manager, to the following attorney for the appellant:

Christopher P. Morgan, Esq.
3009 N. IH 35
Austin, TX 78722
Fax No. (512) 472-9798

/*M. Scott Taliaferro*
M. Scott Taliaferro

# **APPENDIX**

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-13-00490-CR
NO. 03-13-00491-CR
NO. 03-13-00492-CR
NO. 03-13-00493-CR
NO. 03-13-00495-CR

**Gerald Christopher Zuliani, Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NOS. D-1-DC-13-900010, D-1-DC-13-900011, D-1-DC-12-100127, D-1-DC-13-900137 &
D-1-DC-12-900269, HONORABLE P. DAVID WAHLBERG, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Gerald Christopher Zuliani guilty of assault with family violence, *see* Tex. Penal Code § 22.01(b)(2)(A), assault by strangulation, *see id.* § 22.01(b-1), aggravated assault with a deadly weapon, *see id.* § 22.02(a)(2), theft, *see id.* § 31.03(e)(4)(A), and aggravated kidnapping, *see id.* § 20.04. All of the offenses except theft were enhanced by a prior felony conviction. *See id.* § 12.42. The trial court rendered judgments on the jury's verdicts and assessed punishment at 10 years' imprisonment for assault with family violence, 40 years for assault by strangulation, 40 years for aggravated assault with a deadly weapon, 18 months' confinement in a state jail for theft, and 40 years' imprisonment for aggravated kidnapping, with the sentences to run concurrently. On appeal, Zuliani raises nineteen points of error. We will reverse the trial court's

judgment of conviction for theft and render a judgment of acquittal. We will affirm the remainder of the trial court's judgments.

**BACKGROUND**

At trial, complainant Stephanie Running testified to the following facts. Before the events in question, Running was engaged to Zuliani and he was living with her. On Sunday, October 21, 2012, Zuliani began accusing her of having affairs with other men. When Running denied the affairs, Zuliani started hitting her face with his fists. Running tried to curl up in a ball and shield herself with her arm, but Zuliani pulled her arms away and continued hitting her. Zuliani then grabbed Running's neck with both hands and pushed. This made it difficult for Running to breathe, caused her pain, and made her believe that she might pass out.

After Zuliani released her, Running went into the kitchen. Zuliani continued accusing her of having affairs, and Running continued denying it. Zuliani then began hitting Running with a broom handle, causing her to bleed. When Zuliani stopped hitting Running with the broom, she went into the hall bathroom.

Next, Zuliani grabbed the shower curtain rod and pulled it down, separating the rod into two pieces. Zuliani then began hitting Running with half of the shower curtain rod as he continued to accuse her of having an affair. The rod piece broke, so Zuliani then used the other half of the rod to continue striking Running. According to Running, after the rod was "no longer viable as a weapon," Zuliani began striking her with a metal cane. Around this time, Running began bleeding from a gash in her leg.

2

Zuliani then turned the shower on cold and threw Running into the bathtub. After a while, Zuliani told Running to get out of the shower. When Running tried to put on dry clothes, Zuliani would only allow her to put on her underwear. Running testified that she believed she had to listen to Zuliani because if she did not, he would hit her again. Zuliani did not give Running any moments to herself, and she did not feel free to leave.

After Running put on her underwear, Zuliani told her to clean up the house by picking up broken objects and cleaning up her blood. Zuliani instructed Running to work quickly, and when Running did not move fast enough, Zuliani grabbed her and threw her into a wall. Eventually, Zuliani grabbed a two-by-four board from the garage and hit Running with it once or twice on her back.

Soon after being struck by the board, Running wrapped herself in a blanket and ran out the front door while screaming. Zuliani grabbed Running and pulled her back inside. During the next few days, Zuliani at times seemed concerned for Running and would offer her medicine or other aid. At other times, he would yell at her or strike her with his hands. Running testified that although Zuliani left the house for several minutes on Wednesday, she did not attempt to escape or call for help because she was afraid Zuliani was testing her and that he was actually monitoring her.

Finally, on the morning of Thursday, October 25, Running awoke to find Zuliani still sleeping. Running escaped the house by running out the front door. Running eventually presented at a hospital and was treated for multiple injuries.

The jury also heard evidence that on the same day Running escaped, Zuliani left her a text message and voicemail asking if he could deposit a check made payable to Running. Although

Running never responded to those messages, Zuliani deposited the funds into an account he shared with Running. According to evidence presented at trial, Glennis Richter, Zuliani's girlfriend, withdrew the funds from that account beginning about a week after Running's escape.

Zuliani was indicted for five separate offenses, and the cases were consolidated for trial. After a jury found him guilty of all five offenses, Zuliani appealed.[1]

## DISCUSSION

### *Aggravated kidnapping: sufficiency of the evidence*

In his first two points of error, Zuliani contends that the evidence is insufficient to support his conviction for aggravated kidnapping.

The indictment alleged two grounds for finding Zuliani guilty of aggravated kidnapping: Zuliani abducted Running "by using or threatening to use deadly force," *see* Tex. Penal Code § 20.04(b), and he "did then and there intend to facilitate the commission of a felony, to wit: Felony Assault Family Violence," *see id.* § 20.04(a)(3). As Zuliani points out, the jury found that he did not abduct Running with the intent to commit assault with family violence. However, the jury did find Zuliani guilty of aggravated kidnapping and also found that he intentionally or knowingly abducted Running and used or exhibited a deadly weapon. These findings, if supported by sufficient evidence, satisfy the elements of aggravated kidnapping. *See id.* § 20.04(b).

Zuliani does not challenge the jury's deadly-weapon finding. Instead, Zuliani argues that any use or threat of deadly force occurred *before* he allegedly abducted Running. According to

---

[1] For organizational clarity, we will address Zuliani's points of error in a different order than he presents them.

Zuliani, the alleged abduction began when Running ran out the front door and Zuliani pulled her back inside, and he asserts that the State presented no evidence that he used or exhibited a deadly weapon at any time after he forced her back into the house. In other words, Zuliani asserts that because he did not use or exhibit a deadly weapon during or after the abduction, he neither abducted Running "by using or threatening to use deadly force" nor did he "use[] or exhibit[] a deadly weapon during the commission of the offense." *See id.* § 20.04(b).

In reviewing whether the evidence is sufficient to support a conviction, "an appellate court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found each essential element of the offense beyond a reasonable doubt." *Schneider v. State*, 440 S.W.3d 839, 841 (Tex. App.—Austin 2013, pet. ref'd) (mem. op.); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). We do so by comparing the elements of the crime as defined by a hypothetically correct jury charge to the evidence produced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014). In addition, "when the indictment alleges a few, but not all, of the alternative statutory manner and means of committing the offense, the hypothetically correct jury charge against which the sufficiency of the evidence will be measured is limited to only those statutory theories alleged." *Delay v. State*, 443 S.W.3d 909, 917 n.19 (Tex. Crim. App. 2014) (citing *Curry v. State*, 30 S.W.3d 394, 404–05 (Tex. Crim. App. 2000)).

Upon review of the record, we conclude that the State presented sufficient evidence that Zuliani's abduction of Running began even before she ran out the front door and before Zuliani had ceased to use or exhibit deadly weapons. Running testified that on Sunday Zuliani struck her

5

with a broom, a shower curtain, a metal cane, and a two-by-four board, each of which the State alleged to be deadly weapons. During the course of these beatings, Zuliani directed Running's actions. He forced Running into a cold shower and then ordered her to go to the bedroom. Zuliani also prevented her from putting on any clothes except her underwear. Running testified that she did not feel free to leave and that she felt she had to listen to Zuliani because she was afraid that if she did not, he would start hitting her again. Therefore, we conclude that the State presented sufficient evidence that Zuliani "restrained" Running because he "restrict[ed] [her] movements without consent, so as to interfere substantially with [her] liberty, by moving [her] from one place to another or by confining [her]." *See* Tex. Penal Code § 20.01(1) (defining "restrain"). And because Zuliani restrained Running by periodically striking her with deadly weapons, he abducted her. *See id.* § 20.01(2) ("'Abduct' means to restrain a person with intent to prevent his liberation by . . . using or threatening to use deadly force."); *id.* § 1.07(17)(B) ("'Deadly weapon' means . . . anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.").[2]

Accordingly, we conclude that there is sufficient evidence to support Zuliani's conviction for aggravated kidnapping. We overrule Zuliani's first and second points of error.

---

[2] The State had originally included hand or hands in the list of deadly weapons alleged to have been used by Zuliani in the commission of aggravated assault. Zuliani argues that the State later abandoned that theory because the final jury charge did not include "hand" as a possible deadly weapon under the aggravated assault indictment. However, we note that "hand" remains listed as a deadly weapon alternative in the aggravated kidnapping section of the final jury charge. Because we conclude that there is sufficient evidence that Zuliani used a variety of objects as deadly weapons, we need not decide whether the jury could have properly considered Zuliani's hand to be a deadly weapon in connection with his aggravated kidnapping conviction.

*Aggravated kidnapping: jury charge error*

In his twelfth point of error, Zuliani contends that the trial court committed fundamental jury charge error by incorrectly explaining the elements of aggravated kidnapping in the jury charge. In his thirteenth point of error, Zuliani challenges the trial court's denial of his motion for new trial on this ground.

As discussed above, the indictment for aggravated kidnapping alleged that Zuliani intentionally or knowingly abducted Running "by using or threatening to use deadly force," *see id.* § 20.04(b), and that he "did then and there intend to facilitate the commission of a felony, to wit: Felony Assault Family Violence," *see id.* § 20.04(a)(3). The "Relevant Statutes" section of the jury charge contained, among other things, the following instructions:

> A person commits aggravated kidnapping if the person intentionally or knowingly abducts another person with the intent to:
>
> 1. facilitate the commission of a felony; or
> 2. inflict bodily injury on the person; or
> 3. terrorize the person.
>
> Alternatively, a person commits aggravated kidnapping if the person intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense.

The three alternatives listed in the first paragraph correspond to Texas Penal Code section 20.04(a)(3)–(5), respectively. The second paragraph corresponds to section 20.04(b). As Zuliani notes, in addition to the two grounds for conviction alleged in the indictment (20.04(a)(3) and 20.04(b)), the trial court also included in the jury charge instructions for grounds that were not alleged in the indictment (20.04(a)(4) and (5)).

7

Because the three alternatives in the first paragraph followed the phrase, "with the intent to," the "Relevant Statutes" portion of the charge correctly explained that section 20.04(a)(3)–(5) were alternatives requiring a finding of specific intent. *See id.* § 20.04(a) ("A person commits an offense if he intentionally or knowingly abducts another person *with the intent to . . . .*") (emphasis added). However, the "Application of Law to Facts" section of the charge stated, in relevant part:

> You must determine whether the State has proved beyond a reasonable doubt . . . .
>
> 2. Gerald Christopher Zuliani:
> a. acted with the intent to facilitate the commission of a felony, specifically assault with family violence; or
> b. did inflict bodily injury; or
> c. did terrorize Stephanie Running; or
> d. did use or exhibit a deadly weapon, to wit: hand, a metal rod or rods, a wooden object, or a cane.

Alternative 2(a) in the above paragraph, which corresponds to section 20.04(a)(3), correctly explained that this alternative required a finding of specific intent. But alternatives 2(b)–(c), corresponding to section 20.04(a)(4)–(5), incorrectly made it appear that these alternatives did *not* require a finding of specific intent, because they omitted the phrase, "with the intent to," which is found in alternative (a).

The verdict form that the trial court submitted to the jury contained several counts of aggravated kidnapping, each of which alleged a statutory ground for conviction corresponding to 2(a)–(d) of the "Application" portion of the charge, and required the jury to return a verdict on each

8

count. The jury found Zuliani not guilty of abducting Running with the intent to commit a felony (section 20.04(a)(3)) but found him guilty on the other counts (section 20.04(a)(4)–(5), (b)).

Zuliani did not object to this alleged error at trial. Therefore, we will reverse the trial court's judgment only if the error caused Zuliani "actual, egregious harm." *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015); *see Kuhn v. State*, 393 S.W.3d 519, 524 (Tex. App.—Austin 2013, pet. ref'd) ("unobjected-to charge error requires reversal only if it resulted in 'egregious harm'"). Egregious harm must be based on actual harm, not theoretical harm. *Arrington*, 451 S.W.3d at 840. Actual harm is established when the error affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Id.*

Even assuming that the trial court erred in its charge, we conclude that any error did not result in egregious harm to Zuliani. If we disregard the counts of aggravated kidnapping presenting grounds for conviction not alleged in the indictment, the fact remains that the jury specifically found Zuliani guilty of aggravated kidnapping by abducting Running and using or exhibiting a deadly weapon. Zuliani's complaint that the trial court did not properly instruct the jury under section 20.04(a) is irrelevant because the jury found Zuliani guilty under section 20.04(b), which contains no *mens rea* requirement other than that Zuliani intentionally or knowingly abducted Running. *See* Tex. Penal Code § 20.04(b).

Because we conclude that any error did not result in egregious harm to Zuliani, we also conclude that the trial court did not abuse its discretion in denying his motion for new trial on this basis. *See Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014) (appellate court

9

reviews trial court's denial of motion for new trial for abuse of discretion). Accordingly, we overrule Zuliani's twelfth and thirteenth points of error.

### *Bassett's testimony*

In his eighth point of error, Zuliani contends that the trial court abused its discretion in admitting the expert testimony of Margaret Bassett, a victim witness counselor with the Travis County District Attorney's Office.

When the State proffered Bassett's testimony at trial, Zuliani objected, arguing that Bassett was not qualified to testify as an expert witness, *see* Tex. R. Evid. 702, and that her testimony was not relevant, *see id.* R. 402. Zuliani further argued that even if Bassett's testimony were relevant, it should nevertheless be excluded "because of its confusion of the issues, misleading of the jury, and undue delay and needless presentation of cumulative evidence." *See id.* R. 403. Outside the presence of the jury, Bassett explained that her testimony would help explain why a victim of domestic violence may not try to escape an abusive situation for several days. The State argued that Bassett's testimony was relevant because it would help the jury understand why Running did not make another attempt to flee her house after Zuliani dragged her back in on Sunday until Running eventually escaped on Thursday. The State also contended that Bassett's testimony would help the jury understand why a victim may not fight back against her assailant. The trial court overruled Zuliani's objections and allowed Bassett to testify.

If a trial court erroneously admits evidence, the error is non-constitutional and we must determine whether the error was harmful. *See Hankins v. State*, 180 S.W.3d 177, 182 (Tex. App.—Austin 2005, pet. ref'd) ("A violation of the rules of evidence is generally non-constitutional

10

error."). Error is reversible under Rule 44.2(b) when the error affected the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). "Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but slight effect." *Campbell v. State*, 382 S.W.3d 545, 553 (Tex. App.—Austin 2012, no pet.).

We need not decide whether the trial court abused its discretion in admitting Bassett's testimony. Instead, assuming without deciding that the trial court erroneously admitted Bassett's testimony, we conclude that the admission of Bassett's testimony did not affect Zuliani's substantial rights.[3] At trial, Zuliani's counsel mitigated any damage Bassett's testimony may have done by subjecting Bassett to a thorough cross-examination in which Bassett admitted that she worked for the district attorney's office, that the only case information she had received came from conversations with the prosecutors and viewing the offense report, and that her testimony was not scientific. In addition, the sole purpose of Bassett's testimony was to help the jury understand Running's testimony that she did not fight back against Zuliani or attempt to escape for several days. Even without Bassett's testimony, the jury was free to believe Running, and Bassett's testimony essentially provided the same explanation for Running's actions that Running herself

---

[3] We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Jessop v. State*, 368 S.W.3d 653, 666 (Tex. App.—Austin 2012, no pet.). "Such rulings will rarely be disturbed by an appellate court." *Id.* We will uphold the trial court's decision "unless it lies outside the zone of reasonable disagreement," and "[i]f the record supports the trial court's decision . . . there is no abuse of discretion." *Id.*

11

provided—Running was afraid that if she tried to escape, Zuliani would resume beating her. The influential effect of Bassett's testimony, if any, was likely minimal. Therefore, based on the record before us, we cannot conclude that the admission of Bassett's testimony "had a substantial and injurious effect or influence in determining the jury's verdict." *See* Tex. R. App. P. 44.2(b); *Schmutz*, 440 S.W.3d at 39. Because any error the trial court may have committed in admitting Bassett's testimony did not affect Zuliani's substantial rights, we overrule Zuliani's eighth point of error.

### Elaine Zuliani's testimony

In his ninth, tenth, and eleventh points of error, Zuliani contends that the trial court erred in prohibiting Zuliani from eliciting certain testimony from Zuliani's mother Elaine. Zuliani argues that the trial court's ruling violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution, article I, sections 10 and 19 of the Texas Constitution, and Texas Rule of Evidence 613(b). *See* U.S. Const. amends. VI, XIV; Tex. Const. art. I, §§ 10, 19; Tex. R. Evid. 613(b). Although the trial court allowed Elaine to testify, it did not allow her to discuss certain encounters Elaine allegedly had with Running before the events at issue in this case.[4]

We begin by considering the State's argument that Zuliani did not preserve his constitutional claims. The State argues that this case is similar to *Reyna v. State*, 168 S.W.3d 173 (Tex. Crim. App. 2005). In *Reyna*, the defendant sought to elicit testimony from the alleged victim

---

[4] During voir dire outside the presence of the jury, Elaine offered testimony that characterized Running as having drinking problems, being jealous of Zuliani and attempting to prevent his contact with other women, and being prone to aggression.

that the victim had previously made a false accusation of sexual assault. *Id.* at 175. The defendant argued to the trial court that the testimony was relevant to the credibility of the same victim in the defendant's case. *Id.* The State objected, and the trial court sustained the objection. *Id.* On appeal, the court of criminal appeals held that the defendant had failed to preserve his constitutional arguments because he did not clearly articulate them to the trial court. *Id.* at 179. The court noted that the defendant "argued to the trial judge that the evidence should be admitted for 'credibility'" but "did not cite to any rules of evidence, cases, or constitutional provisions." *Id.*

We conclude that *Reyna* controls this case and that Zuliani has failed to preserve his constitutional claims on appeal. Zuliani argued before the trial court that the proffered testimony "goes to show [Running's] general temperament when it comes to Mr. Zuliani in this matter and affects her credibility as well." Like the defendant in *Reyna*, Zuliani "did not cite to any rules of evidence, cases, or constitutional provisions" in support of admission, and he did not clearly articulate a constitutional argument. *See id.* That is, Zuliani did not "do everything necessary to bring to the judge's attention the evidence rule or statute in question and its precise and proper application to the evidence in question." *Id.* (internal quotation marks and footnote omitted). Because we will not reverse the trial court's judgment on a ground he did not present to the trial court, we will not consider Zuliani's constitutional arguments. *See id.* at 180 ("The Court of Appeals erred in reversing Reyna's conviction on a ground that he did not present to the trial judge.").

We next consider whether the trial court's decision to exclude certain portions of Elaine's testimony violated the Texas Rules of Evidence. We review a trial court's ruling under the rules of evidence for an abuse of discretion. *Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App.

13

2009). "We consider the ruling in light of what was before the trial court at the time the ruling was made and uphold the trial court's judgment if it lies within the zone of reasonable disagreement." *Id.* If we conclude that the trial court abused its discretion in excluding evidence, we must then determine whether the trial court's error affected Zuliani's substantial rights. *See id.* at 43; *see also* Tex. R. App. P. 44.2(b).

Assuming without deciding that the trial court abused its discretion in excluding the testimony, we conclude that any error did not affect Zuliani's substantial rights. Elaine's testimony, if fully believed by the jury, would have shown that Running had, on at least a few occasions, exhibited jealousy, aggression, and a tendency to drink too much. Some of this testimony would not have contradicted Running's own testimony and is therefore cumulative. *Campbell*, 382 S.W.3d at 553 (considering whether erroneously admitted evidence was cumulative in harm analysis under Rule 44.2(b)). Running testified at trial, for instance, that shortly before the events in question she had admitted to Zuliani that she wanted to cut down on her drinking. And although evidence of jealousy and aggression may have provided some support to the defense's theory that Running initiated the confrontation with Zuliani, such evidence would have little value for the defense. The trial court did not submit a question on self-defense to the jury. In addition, Running's version of events was supported by physical evidence of her extensive injuries, many of which Zuliani did not attempt to explain at trial. We conclude that the State's case against Zuliani was strong and that the exclusion of portions of Elaine's testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Schmutz*, 440 S.W.3d at 39.

14

Because we determine that any error the trial court may have committed in excluding certain topics of Elaine's testimony did not affect Zuliani's substantial rights, we overrule Zuliani's ninth, tenth, and eleventh points of error.

***State's jury argument***

In his eighteenth point of error, Zuliani challenges the trial court's decision to overrule his objections that the State's jury argument "struck at [Zuliani] over his counsel's shoulders."

During the State's final closing argument at the guilt/innocence phase of trial, the prosecutor made the following allegedly improper statements:

- The bottom line with a lot of the defense is sort of a magic act, smoke and mirrors, red herrings, whatever you want to say—

- So what the Defense is doing is using a lot of tricks, smoke and mirrors . . . .

- So, again, these are all parts of these smoke and mirrors and these red herrings the Defense is sending you on.

- It's the same thing and the reality is the Defense is on sort of a smear campaign with Stephanie Running. They're showing you pictures ostensibly to show what she looked like in a ponytail, but she's flipping off the camera. They say, well, this looks like a couch you sat on. This must be—we want to introduce this picture and it's a very unflattering picture of her. Why are they doing that? It's a smear campaign. She's a drunk, she's so overweight that he could never lift her, and it's all done to embarrass her, to so distract you from what the real evidence in this case is and ask yourself why they're doing that.

We review a trial court's ruling on an objection to improper jury argument for an abuse of discretion. *Nzewi v. State*, 359 S.W.3d 829, 841 (Tex. App.—Houston [14th Dist.] 2012,

15

pet. ref'd) (citing *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010)). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding rules and principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App.1990). "[P]roper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Argument that attacks the defense attorney—that is, strikes at a defendant over the shoulders of counsel—is improper. *Davis*, 329 S.W.3d at 821.

In this case, we need not decide whether the prosecutor's comments in closing argument were improper because we conclude that any error the trial court may have made in overruling Zuliani's objections was not reversible. When argument is improper because it strikes over the shoulders of counsel, we consider three factors in determining whether the trial court's error affected the defendant's substantial rights: "(1) severity of the misconduct (prejudicial effect), (2) curative measures, [and] (3) the certainty of conviction absent the misconduct." *Martinez v. State*, 17 S.W.3d 677, 693 (Tex. Crim. App. 2000) (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

We conclude that the third factor weighs against reversal and is dispositive in this case. The prosecutor's comments encouraged the jury to disbelieve defense arguments that Running initiated the confrontation with Zuliani or that she was not telling the truth about certain details—for example, that she ran out of the house and Zuliani dragged her back inside. However, Running's testimony was corroborated with physical evidence, including evidence of her injuries and of the

16

objects with which Zuliani allegedly struck her. Running had been subjected to cross-examination, and the jury was free to reach its own conclusions about her reliability. Based on the record before us, we conclude that there is a high degree of certainty that the jury would have found Zuliani guilty of the charged offenses even if the prosecutor had not made the allegedly improper comments. Therefore, the trial court's decision to overrule Zuliani's objections to the prosecutor's arguments did not substantially affect Zuliani's rights. Accordingly, we overrule Zuliani's eighteenth point of error.

### *Release in a safe place*

In his nineteenth point of error, Zuliani challenges the trial court's refusal to reduce the punishment range for his conviction of aggravated kidnapping pursuant to Texas Penal Code section 20.04(d). Under that provision, "[a]t the punishment stage of a trial, the defendant may raise the issue as to whether he voluntarily released the victim in a safe place. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." Tex. Penal Code § 20.04(d). At the punishment phase of the trial, Zuliani asked the trial court to find that he voluntarily released Running in a safe place. The trial court denied Zuliani's request without explanation.

The determination of whether a location is a "safe place" under section 20.04(d) is a "fact-specific inquiry made on a case-by-case basis, considering the totality of the circumstances." *Butcher v. State*, 454 S.W.3d 13, 19 (Tex. Crim. App. 2015). Courts may consider seven factors in determining whether a place was safe: "(1) the remoteness of the location, (2) the proximity of help, (3) the time of day, (4) the climate, (5) the condition of the complainant, (6) the character of the

17

location and surrounding neighborhood, and (7) the complainant's familiarity with the location or neighborhood." *Id.* However, these factors are "merely nonexclusive aids." *Id.* (footnote omitted).

We review the trial court's ruling on Zuliani's affirmative defense for both legal and factual sufficiency. *Id.* at 20. In legal-sufficiency review, we first determine whether the record contains a scintilla of evidence favorable to the factfinder's decision. *Id.* We then overturn the factfinder's decision only if the appellant establishes that the evidence conclusively proves the affirmative defense. *Id.* In factual-sufficiency review, we examine the evidence in a neutral light and overturn the factfinder's decision only if the decision is so against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.*

We determine that more than a scintilla of evidence supports the conclusion that Zuliani did not release Running in a safe place, and we also determine that the trial court's ruling was not against the great weight of the evidence. At trial, the jury heard evidence that Zuliani had assaulted Running in her own home over the course of several days. Running testified that Zuliani had thwarted her attempt of escape on Sunday, and when Zuliani had briefly left the house on Wednesday afternoon, Running did not attempt to flee because she was afraid that Zuliani was testing her. In addition, Running was still suffering from multiple injuries when she finally escaped. Upon review of the record, we cannot conclude that the evidence is legally or factually insufficient to support the trial court's ruling on Zuliani's defense under section 20.04(d). Accordingly, we overrule Zuliani's nineteenth point of error.

18

*Motion for election*

In his fourth point of error, Zuliani challenges the trial court's denial of his motion requesting that the State elect which incident it was alleging as aggravated assault. Similarly, in his fifth point of error, Zuliani challenges the trial court's denial of his motion requesting that the State elect which incident it was alleging as aggravated kidnapping. Zuliani argues that the State alleged multiple criminal acts, any of which could support a conviction for aggravated assault. Zuliani notes that the State alleged that he struck Running with several different objects at several different times and in several different locations. Zuliani also argues that the State alleged separate acts, each of which might support a conviction for aggravated kidnapping.[5]

Under certain circumstances, a trial court must order the State to elect which transactions it will rely on for conviction. *See Figueroa v. State*, 250 S.W.3d 490, 505 (Tex. App.—Austin 2008, pet. ref'd). However, an election is not required when the defendant's criminal acts were "part and parcel of the same criminal transaction." *Steele v. State*, 523 S.W.2d 685, 687 (Tex. Crim. App. 1975); *see Herring v. State*, 752 S.W.2d 169, 171 (Tex. App.—Houston [1st Dist.] 1988, no pet.) ("Generally, the State is not required to elect between offenses if the evidence shows that the offenses were committed as part of a single criminal transaction and the defendant is convicted of only one offense.") (citation omitted). In *Steele*, for example, the defendant was

---

[5] The State questions whether Zuliani actually requested that the trial court order the State to elect and whether Zuliani obtained a ruling from the trial court. *See Cosio v. State*, 353 S.W.3d 766 (Tex. Crim. App. 2011) ("A defendant's decision to elect is purely strategic and may be waived or forfeited."). We assume, without deciding, that Zuliani actually moved for an election regarding both his aggravated assault and aggravated kidnapping charges and obtained rulings from the trial court.

convicted of rape by threats. The court of criminal appeals held that multiple acts of sexual intercourse were part of the same criminal transaction because "the evidence show[ed] that the several acts of intercourse were committed by one continuous act of force and threats." *Steele*, 523 S.W.2d at 687.

We conclude that the State alleged only one criminal transaction in its aggravated assault indictment and one criminal transaction in its aggravated kidnapping indictment. Even if Zuliani is correct that several of the acts he allegedly committed could have supported a conviction on their own, "'there may be any number of distinct crimes in a single criminal transaction.'" *Crocker v. State*, 573 S.W.2d 190, 198 (Tex. Crim. App. 1978) (quoting *Whitford v. State*, 24 Tex. Ct. App. 489, 492, 6 S.W. 537, 538 (1887)). All of the alleged actions constituting aggravated assault occurred on Sunday; there was no clear break in the assault, and "a single guilty intent ran through and connected" these assaultive acts. *See McIntire v. State*, 698 S.W.2d 652, 656 (Tex. Crim. App. 1985). In other words, the acts constituting aggravated assault "were committed by one continuous act of force and threats." *Steele*, 523 S.W.2d at 687. Similarly, the jury found that Zuliani abducted Running by using or exhibiting a deadly weapon. Every use or exhibition of a deadly weapon occurred on Sunday in a connected sequence of events.

Because we determine that all of the alleged acts constituting aggravated assault were part of one criminal transaction and that all of the alleged acts constituting aggravated kidnapping were part of one criminal transaction, we conclude that the trial court did not err in refusing to order the state to elect. Accordingly, we overrule Zuliani's fourth and fifth points of error.

20

*Assault with family violence: jury charge error*

In his sixth point of error, Zuliani contends that the trial court committed fundamental jury charge error by failing to instruct the jury that it must unanimously agree on a single assault supporting his conviction of assault with family violence. According to Zuliani, the trial court's charge allowed the jury to convict him by finding only that he intentionally or knowingly caused bodily injury to Running and that he had previously been convicted of family violence. Zuliani argues that the State presented evidence of multiple assaults and that the jury's verdict may have lacked unanimity because "[t]he possible combinations [of assault] are as numerous as the acts/incidents she claimed he caused bodily injury." In his seventh point of error, Zuliani contends that the trial court abused its discretion by denying Zuliani's motion for new trial on this ground.

Contrary to Zuliani's arguments, a jury need only decide unanimously that the defendant committed each element of a crime—it need not unanimously agree on the underlying brute facts that make up each element or which of several means the defendant used to commit each element. *See Johnson v. State*, 364 S.W.3d 292, 296 (Tex. Crim. App. 2012); *see also Stuhler v. State*, 218 S.W.3d 706, 717 (Tex. Crim. App. 2007) ("On facts such as these, the series of acts constitutes the commission of the offense. It follows that the jury charge should not require the jury to agree as to any particular act in the series before it can convict."). Here, the trial court instructed the jury that in order to find Zuliani guilty it had to unanimously agree on each element of assault with family violence. We conclude that the trial court was not required to go further and instruct the jury to unanimously agree on which specific strikes with Zuliani's hands, for example, caused which specific injuries. Therefore, we also conclude that the trial court did not abuse its discretion in

21

denying Zuliani's motion for new trial on this ground. *See Colyer*, 428 S.W.3d at 122 ("We review a trial court's denial of a motion for new trial for abuse of discretion."). Accordingly, we overrule Zuliani's sixth and seventh points of error.

### *Assault by strangulation*

In his fourteenth, fifteenth, sixteenth, and seventeenth points of error, Zuliani challenges his conviction for assault by strangulation.

#### Statute, indictment, and jury charge

A person commits second-degree felony assault by strangulation if the person "intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse," " the offense is committed against a person whose relationship to or association with the defendant is described by [certain sections of the family code]," "it is shown on the trial of the offense that the defendant has been previously convicted of an offense under [certain sections of the penal code] . . . against a person whose relationship to or association with the defendant is described by [certain sections of the family code]," and "the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth." Tex. Penal Code § 22.01(a), (b-1).

The indictment against Zuliani alleged the following:

> [Zuliani] did then and there intentionally, knowingly and recklessly cause bodily injury to [Running], a member of the said [Zuliani's] family and household and with whom [Zuliani] has had a dating relationship, by seizing the said [Running] on or

22

about the neck with his hand, [and Zuliani] did intentionally, knowingly, and recklessly impede the normal breathing and circulation of the blood of [Running], by applying pressure to [Running's] neck with his hand, [and Zuliani] had been convicted of an offense against a member of the said [Zuliani's] family and household and against a person with whom [Zuliani] has had a dating relationship . . . .

The "Relevant Statutes" portion of the trial court's jury charge did not include prior conviction as an element of the offense. In addition, the charge listed as an element of the offense that "the defendant acted with intent to impede the normal breathing or circulation of the blood of another; with knowledge that he would impede the normal breathing or circulation of the blood of another; or with recklessness concerning whether he would impede the normal breathing or circulation of the blood of another." It did not include as an element that the defendant *actually did impede* the victim's breathing or blood circulation.

Similarly, the "Application of Law to Facts" portion of the trial court's jury charge did not mention a prior conviction. That portion stated that the following alternatives comprised the impediment element of the offense:

a. [Zuliani] acted with intent to impede the normal breathing or circulation of the blood of [Running]; or
b. [Zuliani] acted with knowledge that he would impede the normal breathing or circulation of the blood of [Running]; or
c. [Zuliani] acted with recklessness concern whether he would impede the normal breathing or circulation of the blood of [Running].

The "Application of Law to Facts" portion also instructed the jury that the jurors did not have to unanimously agree on any of these three options.

23

The jury returned a verdict of guilty for "the offense of felony assault strangulation." Zuliani pleaded true to the enhancement paragraph alleged in the indictment, and the trial court sentenced him for the offense as a first-degree felony. *See id.* § 12.42(b).

**Zuliani's points of error**

In his fourteenth point of error, Zuliani contends that the trial court's jury charge on strangulation does not allow for him to be convicted of a first-degree felony. Zuliani notes that the charge omitted the prior-conviction element of the offense. Therefore, Zuliani argues, the jury found only the elements necessary to convict him under Texas Penal Code section 22.01(b)(2)(B), a third-degree felony.

In his fifteenth point of error, Zuliani argues that his conviction should be reformed to assault with family violence, not strangulation. As Zuliani notes, the trial court's jury charge allowed the jury to convict him without finding that he actually impeded Running's breathing or blood circulation. According to Zuliani, without a finding on the impediment element, he could have been convicted, at most, of third-degree assault with family violence under Texas Penal Code section 22.01(a)(1) and (b)(2)(A).

In his sixteenth point of error, Zuliani contends that the trial court committed fundamental jury charge error by omitting the prior-conviction element and by not requiring the jury to find beyond a reasonable doubt that Zuliani actually impeded Running's breathing or blood circulation. Zuliani argues that without these two elements, he could have been convicted only of a class-A misdemeanor under Texas Penal Code section 22.01(a). Finally, in his seventeenth point

24

of error, Zuliani challenges the trial court's denial of his motion for new trial on the grounds of fundamental error in the jury charge.

**Analysis**

We conclude that the jury charge contained error because it allowed the jury to find Zuliani guilty without finding that he actually impeded Running's normal breathing or circulation of the blood. *See id.* § 20.01(b-1)(3) (listing "impeding the normal breathing or circulation of the blood" of victim as element of second-degree felony assault by strangulation); *Murphy v. State*, 44 S.W.3d 656, 661 (Tex. App.—Austin 2001, no pet.) ("The trial court is obligated to charge the jury on the law applicable to the case. This requires that the jury be instructed concerning each element of the offense or offenses charged.") (internal quotation marks and citation omitted). In addition, we assume, without deciding, that it was also error for the charge to omit the prior-conviction element.[6]

Zuliani, however, did not object to these errors at trial. Therefore, we will only reverse the trial court's judgment if the error "caused actual, egregious harm" to Zuliani. *Arrington*,

---

[6] The omission of the prior conviction was charge error if the prior conviction was an essential element of the offense. As the State points out, a split of authority exists among the courts of appeals as to whether a prior conviction of family violence is an essential element of an offense under Texas Penal Code section 22.01(b) or a sentence enhancement. *See Olivas v. State*, No. 08-11-00081-CR, 2013 WL 1182208, at *3 (Tex. App.—El Paso Mar. 20, 2013, no pet.) (not designated for publication). This Court has previously declined to resolve the question. *See Smith v. State*, No. 03-06-00430-CR, 2007 WL 2066291, at *5 (Tex. App.—Austin July 18, 2007, no pet.) (mem. op., not designated for publication); *Zavala v. State*, No. 03-05-00051-CR, 2007 WL 135979, at *1 n.2 (Tex. App.—Austin Jan. 22, 2007, no pet.) (mem. op., not designated for publication). Because, as discussed below, we conclude that any error in the strangulation jury charge did not cause egregious harm to Zuliani, we need not decide whether a prior conviction for family violence was an essential element of the offense.

25

451 S.W.3d at 840; *see Kuhn*, 393 S.W.3d at 524. In determining whether charge error has caused egregious-harm, we "consider the entirety of the jury charge itself, the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Jourdan v. State*, 428 S.W.3d 86, 97–98 (Tex. Crim. App. 2014) (quoting *Stuhler*, 218 S.W.3d at 719).

We conclude that neither charge error asserted by Zuliani egregiously harmed him. First, although the charge did not require the jury to find that Zuliani actually impeded Running's breathing or blood circulation, it did require the jury to find that Zuliani "caused bodily injury to [Running] by applying pressure to [Running's] neck with his hand." It also required that Zuliani did so "with intent to impede" Running's breathing or blood circulation, with the knowledge that he was causing such impediment, or with recklessness concerning whether he would cause such impediment. These findings are not so far removed from a finding that Zuliani actually caused impediment for us to conclude that Zuliani suffered egregious harm. In addition, Running testified that Zuliani put his hands around her throat, making it difficult for her to breathe and causing her to fear she might pass out. Under these circumstances, we believe it is unlikely that the jury would have convicted Zuliani of the offense as charged but would not have found him guilty if the offense had been properly charged.

Second, we conclude that the jury charge's omission of the prior-conviction element did not cause Zuliani egregious harm because the jury heard evidence that Zuliani had such a conviction. Indeed, Zuliani stipulated to the existence of a prior conviction for family violence. It is true that the jury was instructed that it could only consider that stipulation in connection with the

26

indictment for assault with family violence. Nevertheless, given that Zuliani stipulated to the conviction, the error did not affect "the very basis of the case." *See Arrington*, 451 S.W.3d at 840 (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). This case was about strangulation, not about a prior conviction.

Because we conclude that any error in the trial court's jury charge on assault by strangulation did not cause Zuliani egregious harm, we also conclude that the trial court did not abuse its discretion in denying Zuliani's motion for new trial on this ground. *See Colyer*, 428 S.W.3d at 122 (appellate court reviews trial court's denial of motion for new trial for abuse of discretion). Accordingly, we overrule Zuliani's fourteenth, fifteenth, sixteenth, and seventeenth points of error.

### Theft: sufficiency of the evidence

In his third point of error, Zuliani contends that the evidence is insufficient to support his conviction for theft. Zuliani argues that the fact that he sent Running messages telling her that he was going to deposit the check, deposited the funds into their joint account to which Running had full access, and did not withdraw the funds establishes that he did not intend to deprive Running of the value of the check. In addition, although the State introduced a bank record that it claimed showed that Zuliani gave Richter access to the account, Zuliani asserts that his signature does not appear on the form.

In reviewing the sufficiency of the evidence, we must determine whether a rational trier-of-fact could have found each essential element of theft beyond a reasonable doubt. *See Schneider*, 440 S.W.3d at 841. A person commits theft "if he unlawfully appropriates property with

27

intent to deprive the owner of property." Tex. Penal Code § 31.03(a). "Appropriation of property is unlawful if . . . it is without the owner's effective consent." *Id.* § 31.03(b)(1).

The State presented evidence that after Running escaped from Zuliani, Zuliani sent Running a voicemail and text message asking for permission to deposit a check made out exclusively to Running. Although Running did not respond to those messages, Zuliani deposited the check into a joint account to which both he and Running had access. The jury also heard evidence that Zuliani's girlfriend Richter withdrew the funds from that account in a series of transactions beginning about a week later. It is undisputed that Running did not expressly consent to Zuliani's taking her check and depositing it into an account to which he had access, and we conclude there is no evidence suggesting that she gave apparent assent. *See id.* § 1.07(a)(11) ("'Consent' means assent in fact, whether express or apparent."); *Baird v. State*, 398 S.W.3d 220, 229 (Tex. Crim. App. 2013) ("For 'assent' 'in fact' to occur, therefore, there must be an actual or real agreement after thoughtful consideration."). Running did not respond to Zuliani's requests for permission to deposit the check, nor did she endorse the check. We therefore conclude that there is sufficient evidence to support the jury's determination that Zuliani appropriated Running's property without effective consent.

We next consider whether the State presented sufficient evidence that Zuliani intended to deprive Running of the value of her property when he deposited the check. For the appropriation of property to constitute theft, the defendant must have intended to deprive the owner of the value of the property at the time the defendant took the property. *Peterson v. State*, 645 S.W.2d 807, 811 (Tex. Crim. App. 1983) ("Relevant intent to deprive the owner of property is the accused's intent at the time of the taking."); *Hernandez v. State*, No. 03-13-00268-CR,

2014 WL 4058828, at *2 (Tex. App.—Austin Aug. 14, 2014, no pet.) (mem. op., not designated for publication). "The fact finder determines intent to deprive from the words and acts of the accused." *Winkley v. State*, 123 S.W.3d 707, 713 (Tex. App.—Austin 2003, no pet.).

According to Running's testimony, Zuliani told Running that he intended to deposit the check. He then deposited the check into a joint account and did not withdraw the funds. Although the State presented evidence that Running seldom if ever used the joint account, it was undisputed that Running knew of the account and had full access to it. We conclude that these facts do not support the conclusion that Zuliani intended to deprive Running of the value of her property at the time he deposited the check.

The State emphasizes that Richter later withdrew all funds from the account and argues that this is evidence that Zuliani was already intending to withdraw the funds at the time he deposited the check. At trial, the State called a bank investigator, who testified that on November 1, about a week after Running escaped and Zuliani was arrested, Zuliani added Richter to the joint account. The investigator referenced State's Exhibit 85 and stated that Zuliani's signature appeared on the signature card of the form adding Richter. However, we have reviewed this exhibit, and we agree with Zuliani that Zuliani's signature does not appear anywhere on the form. Zuliani points out that his name is written on the form in handwriting that is completely different from his signature on other forms in the record. We agree, but more importantly, none of the signatures on the form adding Richter to the account *even purport to be* Zuliani's. Instead, it is evident from the face of the document that Richter herself signed Zuliani's name and then, in the same signature block, signed her own name and indicated that she had power of attorney to sign for Zuliani. Richter also signed

29

her own name in Running's signature block.  Therefore, only Richter's signature appears on the form.  Because the State did not introduce any evidence that Zuliani had granted Richter power of attorney or otherwise granted her authority to access funds in the account, there is insufficient evidence to conclude that Zuliani authorized the addition of Richter to the account.

Disregarding Richter's later actions, we determine that no rational trier-of-fact could have found beyond a reasonable doubt that Zuliani intended to deprive Running of the value of her property when he deposited the check.  Accordingly, we sustain Zuliani's third point of error and will reverse Zuliani's conviction for theft and render a judgment of aquittal.

## CONCLUSION

Having sustained Zuliani's third point of error, we reverse the trial court's judgment of conviction for theft in cause number D-1-DC-13-900137 and render a judgment of acquittal.  Having overruled Zuliani's remaining points of error, we affirm the trial court's judgments of conviction in cause numbers D-1-DC-13-900010, D-1-DC-13-900011, D-1-DC-12-100127, and D-1-DC-12-900269.

30

_____

Scott K. Field, Justice

Before Chief Justice Rose, Justices Goodwin and Field

NO. 03-13-00490-CR     Affirmed

NO. 03-13-00491-CR     Affirmed

NO. 03-13-00492-CR     Affirmed

NO. 03-13-00493-CR     Reversed and Rendered

NO. 03-13-00495-CR     Affirmed

Filed:   May 29, 2015

Do Not Publish